254 F.2d 797
 Orval E. FAUBUS, Governor of the State of Arkansas, General
Sherman T. Clinger, Adjutant General of the State of
Arkansas, and Lt. Col. Marion E. Johnson, Unit Commander of
the Arkansas National Guard (Respondents), Appellant,
v.
UNITED STATES of America (Amicus Curiae, Petitioner), and
John Aaron, a minor, and Thelma Aaron, a minor, by their
mother and next friend (Mrs.) Thelma Aaron, a feme sole, et
al. (Plaintiffs), and William G. Cooper, M.D., as President
of Board of Trustees, Little Rock Independent School
District, et al. (Defendants), Appellees.
 No. 15904.
 United States Court of Appeals Eighth Circuit.
 April 28, 1958.
 
 Kay L. Matthews, Little Rock, Ark., and Thomas Harper, Fort Smith, Ark. (Walter L. Pope, Little Rock, Ark., was with them on the brief), for appellants.
 Donald B. MacGuineas, Atty., Dept. of Justice, Washington, D.C. (George Cochran Doub, Asst. Atty. Gen., Osro Cobb, U.S. Atty., Little Rock, Ark., and Samuel D. Slade, Atty., Dept. of Justice, Washington, D.C., were with him on the brief), for appellee United States of America, amicus curiae.
 Thurgood Marshall, New York City (Wiley A. Branton, Pine Bluff, Ark., was with him on the brief), for appellees John Aaron, et al.
 Hansel Proffitt, Sevierville, Tenn., amicus curiae.
 Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.
 SANBORN, Circuit Judge.
 
 
 1
 This is an appeal from an order of the District Court made September 20, 1957 (filed September 21, 1957), in the action of Aaron v. Cooper, 143 F.Supp. 855, to which the appellants on September 10, 1957, had been made additional parties defendant. The order enjoined the appellants, and others under their control or in privity with them, from using the Arkansas National Guard to prevent eligible Negro children from attending the Little Rock Central High School, and otherwise obstructing or interfering with the constitutional right to such children to attend the school. The order expressly preserved to Governor Faubus the right to use the Arkansas National Guard for the preservation of law and order by means which did not hinder or interfere with the constitutional rights of the eligible Negro students.
 
 
 2
 The appellants assert that the order appealed from must be reversed because the District Judge erred in rejecting an affidavit of prejudice and in refusing to disqualify himself. They assert also that the Court erred: (1) in overruling the motion of the appellants to dismiss the petition of the United States asking that the appellants be made additional defendants in the Aaron case and be enjoined from using the Arkansas National Guard to prevent eligible Negro students from attending the Little Rock Central High School; (2) in overruling appellants' motion to dismiss the petition for failure to convene a three-judge court; and (3) in entering the preliminary injunction.
 
 
 3
 A statement of the events and proceedings which constitute the background of this controversy seems necessary to a full understanding of the questions presented and to show how they arose.
 
 
 4
 The Supreme Court of the United States on May 17, 1954, decided in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, that segregation of white and Negro children in the public schools of a State solely on the basis of race, under state laws permitting or requiring such segregation, denied to Negro children the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States, even though the physical facilities and other tangible factors of white and Negro schools were equal. The case was restored to the Supreme Court's docket to await the formulation of decrees and for further argument on questions not then decided.
 
 
 5
 On May 31, 1955, in 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Supreme Court announced its supplemental opinion and final judgments in the Brown case. We quote some of the pertinent excerpts from the opinion (349 U.S. at pages 298, 299, 300, 75 S.Ct. at page 755):
 
 
 6
 'These cases were decided on May 17, 1954. The opinions of that date, declaring the fundamental principle that racial discrimination in public education is unconstitutional, are incorporated herein by reference. All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle. * * *
 
 
 7
 'Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. * * *
 
 
 8
 '* * * At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.
 
 
 9
 'While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date.'
 
 
 10
 On May 23, 1955, the School Board of the Little Rock School District had adopted and published a statement to the effect that it was the Board's 'responsibility to comply with Federal Constitutional Requirements' and that it 'intended to do so when the Supreme Court of the United States outlines the method to be followed,' and that in the meantime the Board would make the needed studies 'for the implementation of a sound school program on an integrated basis.' At pages 858-859 of 143 F.Supp.
 
 
 11
 The Superintendent of the Little Rock schools, upon instructions from the School Board, prepared a plan for the gradual integration over a period of about seven years of the public schools in Little Rock, commencing at the senior high school level in the fall of 1957. The plan was adopted by the Board on May 24, 1955, and is fully set forth in the opinion of the District Court in Aaron v. Cooper, supra, 143 F.Supp. at pages 859-860, and need not be restated in this opinion.
 
 
 12
 On February 8, 1956, John Aaron and other minor Negroes of school age brought a class action in the United States District Court for the Eastern District of Arkansas against the members of the Little Rock School Board, for the prupose of bringing about the immediate integration of the races in the public schools of Little Rock. The School Board answered the complaint and submitted to the court its plan for integration which it asserted would best serve the interests of both races (at page 858 of 143 F.Supp.). It alleged that a hasty integration would be unwise and would retard the accomplishment of the integration of the Little Rock schools. United States District Judge John E. Miller, who heard the case, filed a comprehensive opinion on August 27, 1956 (143 F.Supp. 855), in which it was determined that the defendants, the school authorities, had acted in the utmost good faith and with the sole objective 'to faithfully and effectively inaugurate a school system in accordance with the law as declared by the Supreme Court.' The District Court ordered that the plan of the defendants be approved as adequate; denied the plaintiffs any declaratory or injunctive relief; and retained jurisdiction of the case for the entry of such other and further orders as might be necessary for the effectuation of the approved plan. (At page 866 of 143 F.Supp.)
 
 
 13
 The plaintiffs appealed. They urged in this Court, as they had in the District Court, that there were no valid reasons why integration in the public schools of Little Rock should not be completely accomplished by September, 1957. On appeal, this Court held, on April 26, 1957, that 'in the light of existing circumstances the plan set forth by the Little Rock School Board and approved by the District Court is in present compliance with the law.' Aaron v. Cooper, 8 Cir., 243, F.2d 361. The judgment of the District Court was affirmed, with its retention of continued jurisdiction.
 
 
 14
 On September 2, 1957, the appellants, Orval E. Faubus, Governor of the State of Arkansas, and Sherman T. Clinger, Adjutant General of the State, stationed units of the Arkansas National Guard, under the command of Lt. Col. Marion E. Johnson, at the Little Rock Central High School. The order of Governor Faubus to General Clinger was as follows:
 
 
 15
 'You are directed to place off limits to white students those schools for colored students and to place off limits to colored students those schools heretofore operated and recently set up for white students. This order will remain in effect until the demobilization of the Guard or until further orders.'
 
 
 16
 As a result of this order, nine Negro school children who, under the School Board's approved plan of integration, had been found eligible to attend the high school, were not, by request of the school authorities, in attendance on September 3, 1957, the opening day of the fall term.
 
 
 17
 The court, by United States District Judge Ronald N. Davies, sitting by assignment, on September 3, 1957, issued an order directing the members of the School Board and the Superintendent of the Little Rock Public Schools, the defendants in Aaron v. Cooper, to show cause why the court, under its reservation of jurisdiction in that case, should not order them to put into effect forthwith the plan of integration approved by the District Court and by the United States Court of Appeals. On the same day, after a hearing on the order to show cause, the court found that, because of the stationing of military guards at the Central High School by state authorities, the defendants (members of the School Board) had reversed the position taken by them in their plan for integration and had requested the eligible Negro students to stay away from the school 'until the legal dilemma was solved.' The court also found that the evidence presented disclosed no reason why the plan of integration approved by the court could not be carried out forthwith. The defendants (members of the School Board and the Superintendent of Schools) were ordered to carry out the plan.
 
 
 18
 Judge Davies on September 4, 1957, wrote the following letter to the United States Attorney for the Eastern District of Arkansas:
 
 
 19
 'Mr. Osro Cobb 'United States Attorney 'Little Rock, Arkansas. 'My dear Mr. Cobb:
 
 
 20
 'I am advised this morning that this Court's order directing the integration of the Little Rock schools under a plan submitted by the Little Rock School Board, which plan has been approved by a Judge of this court and by the United States Court of Appeals for the Eighth Circuit, has not been complied with due to alleged interference with the Court's order.
 
 
 21
 'You are requested to begin at once a full, thorough and complete investigation to determine the responsibility for interference with said order, or responsibility for failure of compliance with said order of this Court heretofore made and filed, and to report your findings to me with the least practicable delay.
 
 
 22
 'Very truly yours, 'Ronald N. Davies 'United States District Judge '(Sitting by Assignment)'
 
 
 23
 On September 7, the court denied a 'petition of the Little Rock School District directors and of the Superintendent of the Little Rock Public Schools for an order temporarily suspending enforcement of its plan of integration heretofore approved by this Court.'
 
 
 24
 On September 9, the court entered the following order:
 
 
 25
 'In The United States District Court For The Eastern District Of Arkansas Western Division
 
 
 26
 'John Aaron, et al, Plaintiffs, vs. 'William G. Cooper, et al, Defendants.
 
 
 27
 No. 3113 Civil.
 
 
 28
 'On the date hereof, the Court having received a report from the United States Attorney for the Eastern District of Arkansas, made pursuant to the Court's request, from which it appears that negro students are not being permitted to attend Little Rock Central High School in accordance with the plan of integration of the Little Rock School Directors approved by this Court and by the Court of Appeals for the Eighth Circuit.
 
 
 29
 'And the Court being of the opinion that the public interest in the administration of justice should be represented in these proceedings and that it will be of assistance to the Court to have the benefit of the views of counsel for the United States as amici curiae, and this Court being entitled at any time to call upon the law officers of the United States to serve in that capacity, now, therefore,
 
 
 30
 'It is ordered that the Attorney General of the United States or his designate, and the United States Attorney for the Eastern District of Arkansas or his designate, are hereby requested and authorized to appear in these proceedings as amici curiae and to accord the Court the benefit of their views and recommendations with the right to submit to the Court pleadings, evidence, arguments and briefs, and for the further purpose, under the direction of this Court, to initiate such further proceedings as may be appropriate.
 
 
 31
 'It is further ordered that the Attorney General of the United States and the United States Attorney for the Eastern District of Arkansas be and they are hereby directed to file immediately a petition against Orval E. Faubus, Governor of the State of Arkansas; Major General Sherman T. Clinger, Adjutant General, Arkansas National Guard; and Lt. Colonel Marion E. Johnson, Unit Commander, Arkansas National Guard, seeking such injunctive and other relief as may be appropriate to prevent the existing interferences with and obstructions to the carrying out of the orders heretofore entered by this court in this case.
 
 
 32
 'Dated at Little Rock, Arkansas, this 9th day of September, 1957.
 
 
 33
 'Ronald N. Davies 'United States District Judge '(Sitting by Assignment)'
 
 
 34
 On September 10, the United States, by its Attorney General and the United States Attorney for the Eastern District of Arkansas, filed a petition pursuant to the court's order, stating that units of the Arkansas National Guard were still Forcibly preventing and restraining Negro students, eligible under the approved plan of school integration, from entering school and attending classes; that the acts of the appellants, through the use of the Arkansas National Guard, were obstructing and interfering with the effectuation of the court's orders of August 28, 1956, and September 3, 1957, 'contrary to the due and proper administration of justice.' The United States asked that the appellants be made additional parties defendant in the Aaron case and be enjoined, together with those under their control or in privity with them, from using the National Guard to prevent the eligible Negro students from attending the Little Rock High School, and otherwise obstructing or interfering with the effectuation of the court's orders in that regard.
 
 
 35
 The court on September 10, 1957, added the appellants as defendants in the Aaron case, and set the Government's petition for a preliminary injunction for hearing on September 20, 1957.
 
 
 36
 On September 19, 1957, the day before the hearing, Governor Faubus filed an affidavit of prejudice against Judge Davies, stating that he was informed and believed Judge Davies had a personal prejudice against him and a personal bias in favor of the plaintiffs John Aaron et al. and the United States. The reasons for the Governor's belief were stated at length in this affidavit.
 
 
 37
 The United States on September 20, 1957, the day of the hearing, moved the court to strike the affidavit of prejudice as untimely and legally insufficient.
 
 
 38
 The appellants, at the hearing on September 20, 1957, moved for a dismissal of the petition of the United States on the grounds that the court was without authority to make the order of September 10 bringing the Government, the Attorney General, and the United States Attorney into the case; that the petition was illegally and prematurely filed by the Government; that the Government and its law officers were without standing to maintain the action against the appellants; that the court was without jurisdiction to entertain the action; that the action was in fact against the State of Arkansas; and that the court was without power to question the judgment and discretion of Orval E. Faubus, as Governor of Arkansas, in his use of the Arkansas National Guard.
 
 
 39
 The plaintiffs John Aaron et al., at the hearing on September 20, 1957, were granted leave to file, and did file, a supplemental complaint against the appellants as additional defendants, in which the plaintiffs prayed for a preliminary injunction to prohibit the appellants from using the Arkansas National Guard to prevent the orders of the court requiring effectuation of the approved plan of integration from being carried out. The only objection to the filing of the plaintiffs' supplemental complaint and its consolidation with the petition of the Government was made by the appellants upon the ground that 'these plaintiffs have passed out of this action by the Court's order of August 15, 1956, in denying their prayer for relief.'
 
 
 40
 At the hearing the court granted the motion of the Government to strike the affidavit of prejudice on the grounds that it was untimely filed and was legally insufficient. The court then denied the several motions of the appellants to dismiss the petition of the Government.
 
 
 41
 At the conclusion of the hearing on September 20, 1957, the court made the following statement:
 
 
 42
 'It is very clear to this Court from the evidence and the testimony adduced upon the hearing today that the plan of integration adopted by the Little Rock School Board and approved by this Court and the Court of Appeals for the Eighth Circuit has been thwarted by the Governor of Arkansas by the use of National Guard troops.
 
 
 43
 'It is equally demonstrable from the testimony here today that there would have been no violence in carrying out the plan of integration and that there has been no violence.
 
 
 44
 'The petition of the United States of America as amicus curiae for a preliminary injunction against Governor Faubus, General Clinger and Colonel Johnson, and all others named in the petition is granted; and such injunction shall issue without delay, enjoining those respondents from obstructing or preventing, by use of the National Guard or otherwise, the attendance of Negro students at Little Rock Central High School under the plan of integration approved by this Court and from otherwise obstructing or interfering with orders of this Court in connection with the plan of integration.
 
 
 45
 'Findings of fact, conclusions of law and order, and related instruments will be prepared by the attorneys for the United States.'The order granting the preliminary injunction, from which this appeal has been taken, was made on September 20, 1957, and filed on September 21, 1957, together with supporting findings of fact and conclusions of law, the sufficiency of which is not challenged.
 
 
 46
 The first question for decision is whether the affidavit of prejudice filed by Governor Faubus against Judge Davies the day before the petition of the Government and the supplemental complaint of the plaintiffs seeking a preliminary injunction were heard, was timely and sufficient.
 
 
 47
 Section 144 of Title 28 U.S.C., so far as pertinent, provides:
 
 
 48
 'Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 
 
 49
 'The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. * * *.'
 
 
 50
 No facts are stated in the affidavit of prejudice which, in our opinion, justified the Governor in waiting until the day before the hearing to file it. He stated in his affidavit that he did not file it ten days 'before the beginning of the present term of court for the reason that he had not at that time been made respondent in this case, and that he was not, in fact, made a respondent herein until September 10, 1957.' He also stated that he filed it as soon 'as the facts of the bias and prejudice of Judge Davies became known to him.' The reasons given by the Governor for his belief that Judge Davies had a personal prejudice against him and a bias in favor of his adversaries are all based on events occurrences and proceedings which took place and were well known before September 10, 1957.
 
 
 51
 There was, in our opinion, undue delay in the filing of the affidavit of prejudice. See and compare, Bishop v. United States, 8 Cir., 16 F.2d 410, 411-412; Rossi v. United States, 8 Cir., 16 F.2d 712, 716; Bommarito v. United States, 8 Cir., 61 F.2d 355. The situation called for the utmost promptness if Judge Davies was to be disqualified and another judge assigned to take his place. Apparently no other federal district judge then in either District in Arkansas was available. We find it unnecessary to consider whether the affidavit would have been sufficient to disqualify Judge Davies had it been filed in time.
 
 
 52
 The second question for decision is whether the District Court had jurisdiction to make its order of September 9, 1957, inviting the Attorney General and the United States Attorney to appear as amici curiae, and authorizing them to submit pleadings, evidence, arguments and briefs, and to file a petition for injunctive relief to prevent obstructions to the carrying out of the court's orders. The appellants contend that the court was without authority to make the order, and that the Attorney General and the United States Attorney as amici curiae were without authority to file a petition for injunctive relief.
 
 
 53
 The District Court in the Aaron Case, as has already been stated, reserved, in its judgment and decree, jurisdiction 'for the entry of such other and further orders as may be necessary to obtain the effectuation of the plan (of gradual school integration)' as contemplated and set forth in its opinion. When the court was informed that the effectuation of the plan which it had approved and ordered into effect was being prevented by the appellants' use of the National Guard, action was called for to vindicate the court's judgment and orders.
 
 
 54
 It was proper for the court to do all that reasonably and lawfully could be done to protect and effectuate its orders and judgments and to prevent them from being thwarted by force or otherwise. The court could not, with propriety, employ private counsel to do the necessary investigative and legal work. It has, we think, always in the past been customary for a federal District Court to call upon the law officers of the United States for aid and advice, in comparable situations.
 
 
 55
 As the Supreme Court said in Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 581, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447, 'After all, a federal court can always call on law officers of the United States to serve as amici * * *. Amici selected by the court to vindicate its honor ordinarily ought not to be in the service of those having private interests in the outcome.'
 
 
 56
 In our opinion, the status of the Attorney General and the United States Attorney was something more than that of mere amici curiae in private litigation. They were acting under the authority and direction of the court to take such action as was necessary to prevent its orders and judgments from being frustrated and to represent the public interest in the due administration of justice.
 
 
 57
 It seems to us unnecessary to labor the point, since the plaintiffs in the Aaron case were, at the time of the hearing on September 20, 1957, still real parties in interest and they joined the Government in praying for the preliminary injunction which was granted and which we do not doubt the court had power to grant. We are satisfied that the District Court did not abuse its discretion in granting the preliminary injunction. See Shearman v. Missouri Pacific Railroad Co., 8 Cir., 250 F.2d 191, 195.
 
 
 58
 Whether the District Court should have dismissed the petitions of the United States and the plaintiffs for injunctive relief, for failure to convene a three-judge District Court under 28 U.S.C. 2281, is the next question for review.
 
 
 59
 That section-- which is headed 'Injunction against enforcement of State statute; three-judge court required'-- provides:
 
 
 60
 'An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.'
 
 
 61
 Neither the petition of the United States nor the supplemental complaint of the plaintiffs challenged the validity of any provisions of the Constitution or laws of Arkansas conferring executive and military powers on the Governor. The only claim made was that the Governor was using military force in violation of law and of the plaintiffs' rights under the Constitution of the United States and the orders of the court. No claim was made that he could not use the Arkansas National Guard to preserve law and order. His right to do so was expressly recognized by the District Court. The appellees' contention is, in effect, that he could not use State troops, ostensibly to preserve order, in violation of law.
 
 
 62
 In a comparable situation, the Supreme Court in Phillips v. United States, 312 U.S. 246, 252-253, 61 S.Ct. 480, 484, 85 L.Ed. 800, held 28 U.S.C. 2281 inapplicable. In that case the Court said:
 
 
 63
 '* * * But an attack on lawless exercise of authority in a particular case is not an attack upon the constitutionality of a statute conferring the authority even though a misreading of the statute is invoked as justification. At least not within the Congressional scheme of 266 (now 28 U.S.C. 2281). It is significant that the United States in its complaint did not charge the enabling acts of Oklahoma with unconstitutionality, but assailed merely the Governor's action as exceeding the bounds of law. In other words, it seeks a restraint not of a statute but of an executive action. But the enforcement of a 'statute', within the meaning of 266, is not sought to be enjoined merely because a state official seeks shelter under it by way of defense against a charge of lawlessness. * * *
 
 
 64
 '* * * No one questions Oklahoma's authority to give her Governor 'Supreme Executive power' nor to make him Commander-in-Chief of her militia. What is here challenged is a single, unique exercise of these prerogatives of his office. * * *'
 
 
 65
 The Supreme Court distinguished Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375, which had been decided by a three-judge District Court. It said of that case (at page 253 of 312 U.S. at page 484 of 61 S.Ct.):
 
 
 66
 'Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375, which is invoked as a precedent, was a very different case. There martial law was employed in support of an order of the Texas Railroad Commission limiting production of oil in the East Texas field. The Governor was sought to be restrained as part of the main objective to enjoin 'the execution of an order made by an administrative * * * commission', and as such was indubitably within 266. * * *'
 
 
 67
 While we are of the opinion that it would not have been improper, and would probably have been wise, for the District Judge to have convened a three-judge District Court to hear the petitions for a preliminary injunction, we think, in view of Phillips v. United States, supra, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800, he was not compelled to do so. Had he convened such a court, its order, like that of a single district judge, would have been appealable to the United States Court of Appeals, and not directly to the Supreme Court of the United States. Phillips v. United States, supra, at page 254 of 312 U.S., at page 484 of 61 S.Ct. The appellants' contention that they were entitled to a dismissal because of the District Court's failure to convene a three-judge court is overruled on the authority of the Phillips case.
 
 
 68
 We think there is no merit in the appellants' argument that the discretion of the Governor in using the National Guard in derogation of the judgment and orders of the federal District Court and in violation of the constitutional rights of the eligible Negro students could not be questioned. In Sterling v. Constantin, 287 U.S. 378, at page 397, 53 S.Ct. 190, at page 195, 77 L.Ed. 375, the Supreme Court said of an analogous contention:
 
 
 69
 'If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the state may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable. Thereis no such avenue of escape from the paramount authority of the Federal Constitution. When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression. * * *'
 
 
 70
 In that case the Court also said (at page 393 of 287 U.S., at page 193 of 53 S.Ct.):'The District Court had jurisdiction. The suit is not against the state. The applicable principle is that, where state officials, purporting to act under state authority, invade rights secured by the Federal Constitution, they are subject to the process of the federal courts in order that the persons injured may have appropriate relief. * * * The Governor of the state, in this respect, is in no different position from that of other state officials. * * *'
 
 
 71
 See also and compare, Powers Mercantile Co. v. Olson, D.C.Minn., 7 F.Supp. 865, 868, and Strutwear Knitting Co. v. Olson, D.C.Minn., 13 F.Supp. 384. What was said, more than twenty years ago, in the case last cited, in which a United States District Court for the District of Minnesota, composed of three judges, in 1936, enjoined the Governor of Minnesota, the Adjutant General of the State, and the Mayor of Minneapolis, from using the Minnesota National Guard, under the guise of preserving law and order, to deprive the Strutwear Company of the use of its plant because of a strike, may, we think, with propriety be repeated here (at page 391 of 13 F.Supp.):
 
 
 72
 'That surrender to the demands of a public enemy in time of war or accession to the demands of insurrectionists or rioters, at other times, is one way of restoring peace and quelling disorder, no one will deny. It has a direct, even though a dishonorable, relation to the maintenance of order, but no relation at all to the preservation of law. It results in the restoration of peace and order at the sacrifice of law. As the plaintiff has aptly pointed out in this case, it does not require troops or police to assist it in surrendering its constitutional rights to possess and use its plant. It can do that for itself.
 
 
 73
 'It is certain that while the state government is functioning, it cannot supress disorders the object of which is to deprive citizens of their lawful rights, by using its forces to assist in carrying out the unlawful purposes of those who create the disorders, or by suppressing rights which it is the duty of the state to defend. The use of troops or police for such purposes would breed violence. It would constitute an assurance to those who resort to violence to attain their ends that, if they gathered in sufficient numbers to constitute a menace to life, the forces of law would not only not oppose them, but would actually assist them in accomplishing their objective. There could be but one final result, namely, a complete breakdown of government and a resort to force both by the law-abiding and the lawless. A rule which would permit an official, whose duty it was to enforce the law, to disregard the very law which it was his duty to enforce, in order to pacify a mob or suppress an insurrection, would deprive all citizens of any security in the enjoyment of their lives, liberty, or property. The churches, the stores, the newspapers, and the channels of communication and of trade and commerce, and the homes of the people themselves, could be closed by the civil authorities under such a rule, in case the owners had in some way offended a sufficiently large group of persons willing to resort to violence in order to close them. Carried to its logical conclusion, the rule would result in the civil authorities suppressing lawlessness by compelling the surrender of the intended victims of lawlessness. The banks could be closed and emptied of thier cash to prevent bank robberies; the post office locked to prevent the mails being robbed; the citizens kept off the streets to prevent holdups; and a person accused of murder could be properly surrendered to the mob which threatened to attack the jail in which he was confined.'Our conclusion is that nothing advanced by the appellants in the instant case would justify the reversal by this Court of the order appealed from.
 
 
 74
 The order is affirmed.