**John AARON et al., Plaintiffs,**

v.

**Ed I. McKINLEY, Jr., President, and Everett Tucker, Jr., Ben D. Rowland, Sr., Russell H. Matson, Jr., Robert W. Laster and Ted L. Lamb, Members of the Board of Directors, Little Rock School District, et al., Defendants.**

Civ. A. No. 3113.

United States District Court
E. D. Arkansas, W. D.

June 18, 1959.

See, also, 169 F.Supp. 325.

Wiley A. Branton, Pine Bluff, Ark., and Thurgood Marshall, New York City, for plaintiffs.

Herschel H. Friday, Jr., and Robert V. Light, Little Rock, Ark., for defend-

ants Ed I. McKinley, Jr., President, and Everett Tucker, Jr., Ben D. Rowland, Sr., Russell H. Matson, Jr., Robert W. Laster and Ted L. Lamb, Members of the Board of Directors, Little Rock School District; and Terrell E. Powell, Superintendent, Little Rock Public Schools.

Walter L. Pope, Little Rock, Ark., Kay Matthews, Little Rock, Ark., and Thomas Harper, Fort Smith, Ark., for defendant Orval E. Faubus, Governor of the State of Arkansas.

Bruce Bennett, Atty. Gen. of Arkansas, Ben J. Harrison, Asst. Atty. Gen. of Arkansas, and Bill J. Davis, El Dorado, Ark., for defendants Marvin Bird, Allen Lynch, John G. Rye, M. P. Jones, Tom Whiteside, W. D. McKay, T. C. Cogbill, Jr., Dr. John Cole and Rabie Rhodes, Members State Board of Education of Arkansas; Arch W. Ford, Commissioner of Education of Arkansas; Harvey Z. Snell, Budget Director of the State Department of Education; Joe Hudson, Disbursing Officer of the State Department of Education; Orvel M. Johnson, State Legislative Auditor; Jimmie Jones, State Auditor; and J. Vance Clayton, State Treasurer.

Osro Cobb, U. S. Atty., Little Rock, Ark., and St. John Barrett, Atty., Dept. of Justice, Washington, D. C., for the United States of America, amicus curiae.

Before SANBORN, Circuit Judge, and MILLER and BECK, District Judges.

PER CURIAM.

This case was tried and argued to this statutory three-judge court on May 4, 1959, upon the issues raised by the supplemental complaint of the plaintiffs and the answers of the defendants. The action is a class action brought by school-age children of the Negro race and their parents and guardians, all residents of Little Rock, Arkansas. Declaratory and injunctive relief is sought against the defendants, State officers of the State of Arkansas, upon the claim that Act No. 4 of the Second Extraordinary Session of the Sixty-first General Assembly, 1958, of that State, pursuant to which the Governor on September 12, 1958, closed the four senior public high schools of Little Rock, both Negro and white, is unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, and that Act No. 5 of the same Session, as later amended, by virtue of which state funds allocable to the Little Rock School District for the maintenance and operation of its public schools have been withheld from the District and diverted to other schools, is likewise unconstitutional and void.

The defendants are the Governor of Arkansas, the State Commissioner of Education, the members of the State Board of Education, the Superintendent of the Little Rock Public Schools, the members of the Board of Directors of the Little Rock School District, and other State officers asserted to have a relation to the case.

In their supplemental complaint, the plaintiffs allege:

"Acts No. 4 and 5, as amended by Act 151 of the Arkansas Acts of 1959, are part of a studied plan devised by the Governor and General Assembly of Arkansas to preserve racial segregation in the public schools and thus evade or frustrate compliance with the decision of the Supreme Court of the United States in the *School Segregation Cases* and, more specifically, the decrees of this Court, the Court of Appeals and the Supreme Court in the instant case. Each order of the federal courts to implement the constitutional rights of plaintiffs and others similarly situated to an unsegregated education has been met by action of the legislative and executive departments of Arkansas designed to nullify those orders. (Report of the Governor's Committee to Make Recommendations for Official Action, February 24, 1956; Constitutional Amendment No. 44 to the Constitution of Arkansas, adopted Nov. 6, 1956; Arkansas Statutes 1947, §§ 6–801 to 6–824;

Arkansas Statutes 1947, §§ 80–1519 to 80–1525, Acts No. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 of the General Assembly of Arkansas, 2nd Extraordinary Session 1958, approved September 12, 1958.)

"The State of Arkansas has undertaken as a state function to provide a system of free public schools for the education for all persons between the ages of six and twenty-one years. Arkansas Constitution Article 14, § 1.

"Acts No. 4 and 5 as amended by Act No. 151 of the Arkansas Acts of 1959, in authorizing the closing of the public high schools of the Little Rock School District, the withholding of funds from them because they were in the process of being desegregated pursuant to Court order, and the payment of said funds to 'non-profit private' schools which enroll pupils who formerly attended the schools now closed, is designed to nullify the orders of this Court and to condition the maintenance of public schools upon their operation in an unconstitutional manner and upon the waiver by plaintiffs of rights secured to them by the Constitution of the United States, all in violation of rights, privileges and immunities guaranteed to plaintiffs by the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States."

The plaintiffs ask this Court to declare Act No. 4 and Act No. 5, as amended, unconstitutional; to enjoin the defendants and those in concert with them from enforcing or seeking to enforce the Acts in question; to enter a judgment ordering that the public schools in Little Rock be opened, operated and maintained on a nonsegregated basis in accordance with the previous orders of the United States Courts in that regard; and to enjoin the defendants from further acts to prevent the carrying out of such federal court orders.

The complete history of this controversy from its inception to September 12, 1958, has been stated by the Supreme Court of the United States in its opinion in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, unanimously affirming the United States Court of Appeals for the Eighth Circuit, 257 F.2d 33, in reversing an order of the United States District Court, 163 F.Supp. 13, suspending the approved plan of gradual integration for the period of two and one-half years.

The Supreme Court had on September 12, 1958, in that case, entered an order reading as follows, at page 5 of 358 U.S., at page 1403 of 78 S.Ct.:

"It is accordingly ordered that the judgment of the Court of Appeals for the Eighth Circuit, dated August 18, 1958, [257 F.2d 33] reversing the judgment of the District Court for the Eastern District of Arkansas, dated June 20, 1958, [163 F.Supp. 13] be affirmed, and that the judgments of the District Court for the Eastern District of Arkansas, dated August 28, 1956, [see 143 F.Supp. 855] and September 3, 1957, enforcing the School Board's plan for desegregation in compliance with the decision of this Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, be reinstated. It follows that the order of the Court of Appeals dated August 21, 1958, staying its own mandate is of no further effect.

"The judgment of this Court shall be effective immediately, and shall be communicated forthwith to the District Court for the Eastern District of Arkansas."

Upon the entry of that order, the Little Rock School Board and the Superintendent of Schools were again under mandate to carry out the approved plan of integration of the schools of Little Rock.

The further history of this litigation and its factual background is to be found in the opinion of the Court of Appeals for the Eighth Circuit, of November 10, 1958, in Aaron v. Cooper, 261 F.2d 97. That court points out that after its opin-

ion of August 18, 1958 (257 F.2d 33), holding to be legally unwarranted the 2½-year suspension of the approved plan of integration granted by the District Court in 163 F.Supp. 13, the Governor of Arkansas called the General Assembly into extraordinary session; that on August 26, 1958, it passed, with emergency clauses, the two Acts in question, which, however, were not signed by the Governor until September 12, 1958, the day the Supreme Court of the United States entered its order in Cooper v. Aaron, affirming the decision of the Court of Appeals for the Eighth Circuit, 257 F.2d 33; that on the same day, acting under the authority purportedly conferred upon him by Act No. 4, the Governor issued a proclamation closing all of the senior high schools of Little Rock, and called for an election in the School District, to vote on the alternative ballot proposition of "For Racial Integration of All Schools Within the ———— School District" or "Against Racial Integration of All Schools Within the ———— School District"; that Act No. 4 provided that, unless a majority of the qualified electors of the District voted in favor of integration, "no school within the district shall be integrated," and that a school closed by executive order authorized by the Act "shall remain closed until such executive order is countermanded by proclamation of the Governor"; and that the vote at the election was about 19,000 against, and 7,500 for, racial integration of all schools in the Little Rock School District (page 101 of 261 F.2d).

Speaking of Act No. 5, the Court of Appeals said, on page 99 of 261 F.2d:

"Act No. 5 was complementary to Act No. 4, in its provisions for withholding from a school district, in which the Governor had ordered a school closed, a pro rata share of the State funds otherwise allocable to such district and of the funds allocable from the County General School Fund, and making such withheld funds available, on a per capita basis, to any other public school or any non-profit private school accredited by the State Board of Education (of which the Governor was a member), which should be attended by students of a closed school, with an obligation being imposed upon the State Board of Education in these circumstances to make such payments. §§ 2 and 3."

While the Court of Appeals expressed no opinion with respect to the constitutionality of Acts No. 4 and 5, it ruled that the Little Rock School Board, which was under mandate of the federal District Court to effectuate the plan for the gradual integration of the public schools of Little Rock approved by that Court in Aaron v. Cooper, 143 F.Supp. 855 (affirmed in Aaron v. Cooper, 8 Cir., 243 F. 2d 361), could not lease the high school buildings of the District to a Private School Corporation for the operation of schools on a segregated basis, nor could the School Board otherwise disable itself from carrying out the court-approved plan of integration.

The District Court was directed by the Court of Appeals to enjoin the School Board, its members, and their successors, from transferring the high schools or other property of the District for the carrying on of any segregated school operations of any nature and to provide that the Board and its members and their successors "shall take such affirmative steps as the District Court may hereafter direct, to facilitate and accomplish the integration of the Little Rock School District in accordance with the Court's prior orders" (page 108 of 261 F.2d).

The Supreme Court of Arkansas on April 27, 1959, by a four-to-three majority, in the case of Garrett v. Faubus, Ark., 323 S.W.2d 877, 884, held that Act No. 4 did not conflict with any provision of the Constitution of the State of Arkansas or with the Constitution of the United States. Justice Ward wrote the opinion of the Court. Justice Robinson and Chief Justice Harris each wrote a concurring opinion.

The four justices of that Court who believed that the Act was valid both under the Constitution of Arkansas and the

Constitution of the United States were of the view that the Act represented a reasonable and proper exercise of the police power of the State to meet a temporary emergency, and—to quote from the opinion of Justice Ward—"to protect the peace and welfare of the people, and to effect a workable solution of this momentous problem [integration of the schools] —all within the framework of the Brown opinion [Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083]."

Justice Robinson, in his concurring opinion, had this to say (page 892 of 323 S.W.2d):

"* * * In order to prevent violence that would be brought about by sending the Negro children to White schools, and to prevent the use of armed troops in the school buildings and on the school grounds, the Legislature authorized the Governor to close the school affected. But, undoubtedly, the General Assembly felt that if a majority of the voters, including Negro voters (who constitute a large percentage of the total electors in Little Rock), felt that the schools should be opened, then the schools could be conducted without the use of troops and United States Marshals. Act No. 4, therefore, provides for an election to determine if the people wanted the schools opened. Such an election was held, and the vote was overwhelming in favor of keeping the schools closed." [1]

Chief Justice Harris was also of the view that Act No. 4 represented a valid exercise of the police power of the State to meet a situation "sufficiently inimical to the public safety and welfare to justify the legislation * * *."

Justice McFaddin, in his dissenting opinion, expressed the view that Act No. 4 was violative of Section 1 of Article 14 of the State Constitution providing that "* * * the State shall ever maintain a general, suitable and efficient system of free [public] schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction," and opposed to decisions of the Arkansas Supreme Court construing that provision of the Arkansas Constitution.

Among other things, Justice McFaddin said (page 900 of 323 S.W.2d):

"* * * If the People of Arkansas want to strike Art. 14 from the Constitution, then the schools may be closed under some legislation similar to Act No. 4. But until Art. 14 of the Constitution is repealed, then it is my solemn and sincere view that Act No. 4 is violative of the Arkansas Constitution."

He expressed the view that the police power of a state may not be used to invade or impair the liberty of citizens guaranteed by the State Constitution, and said: "In short, the Arkansas Legislature cannot, under the guise of the police power, enact legislation contrary to the Arkansas Constitution." He stated that the situation with which the Court was dealing was not the kind of an emergency that permits the use of "Emergency Police Powers," and further said, in that regard: "Rather, we are dealing with a condition that has already existed since 1954 and will continue to exist until either the United States Constitution is amended or the United States Supreme Court overrules Brown v. Board of Education."

Apparently, all of the State Justices were agreed that Section 1 of Article 14 of the Constitution of Arkansas requires the continued maintenance by the State of free public schools. In Justice Ward's opinion, in which Justice Robinson and Chief Justice Harris concurred, it is said (pages 880–881 of 323 S.W.2d):

"* * * If Act 4 is viewed as giving the Governor the power to close all public schools permanently, it would, we concede, be in violation of All Schools * * *," and not upon the question of having the schools open or closed.

1. It is to be noted that the only choice given voters under Act No. 4 was to vote either for or against "Racial Integration of All Schools * * *," and not upon the question of having the schools open or closed.

not only of the decree in the Brown case [Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083] but also of the State Constitution, but we do not consider it that way. * * * we take it as well understood that the Act was intended to slow down the implementation of integration until it could be accomplished without great discomfort and danger to the people affected or until a lawful way could be devised to escape it entirely. * * *"

As we read the opinion of the Supreme Court of the United States in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5, it, in effect, holds that no lawless violence or threat, fear or anticipation of such violence, resulting from hostility to the integration of its schools, can justify any State, under the guise of the exercise of its police power, in depriving citizens, either temporarily or permanently, of rights guaranteed them by the Constitution of the United States. The Court said (pages 16–17 of 358 U.S., page 1409 of 78 S.Ct.):

"The constitutional rights of respondents [Aaron, et al.] are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous opinion in a case involving another aspect of racial segregation: 'It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution.' Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149. Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights. The record before us clearly establishes that the growth of the Board's

difficulties to a magnitude beyond its unaided power to control is the product of state action. Those difficulties, as counsel for the Board forthrightly conceded on the oral argument in this Court, can also be brought under control by state action.

"The controlling legal principles are plain. The command of the Fourteenth Amendment is that no 'State' shall deny to any person within its jurisdiction the equal protection of the laws. 'A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government * * * denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning.' Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676. Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, see Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667; Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 353 U.S. 230, 77 S. Ct. 806, 1 L.Ed.2d 792; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; or whatever the guise in which it is taken, see Derrington v. Plummer, 5 Cir., 240 F.2d 922; Department of Conservation and Development v. Tate, 4 Cir., 231 F.2d 615. In short, the constitutional rights of children not to be discriminated against in school admission

on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.' Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84."

Mr. Justice Frankfurter, in his concurring opinion, said (pages 21–22 of 358 U.S., page 1411 of 78 S.Ct.):

"The use of force to further obedience to law is in any event a last resort and one not congenial to the spirit of our Nation. But the tragic aspect of this disruptive tactic was that the power of the State was used not to sustain law but as an instrument for thwarting law. The State of Arkansas is thus responsible for disabling one of its subordinate agencies, the Little Rock School Board, from peacefully carrying out the Board's and the State's constitutional duty. Accordingly, while Arkansas is not a formal party in these proceedings and a decree cannot go against the State, it is legally and morally before the Court.

"We are now asked to hold that the illegal, forcible interference by the State of Arkansas with the continuance of what the Constitution commands, and the consequences in disorder that it entrained, should be recognized as justification for undoing what the Board of Education had formulated, what the District Court in 1955 had directed to be carried out, and what was in process of obedience. No explanation that may be offered in support of such a request can obscure the inescapable meaning that law should bow to force. To yield to such a claim would be to enthrone official lawlessness, and lawlessness if not checked is the precursor of anarchy. * * *"

See, also, Faubus v. United States, 8 Cir., 254 F.2d 797, 807.

■ The deplorable conditions which were found by the Honorable Harry J. Lemley, United States District Judge, to have existed at Little Rock Central High School during the 1957–58 school year, when nine Negro students were enrolled in the formerly all-white school attended by about 2,000 pupils, and which he honestly and sincerely believed justified granting a 2½-year moratorium to the School Board in the carrying out of its plan of integration (Aaron v. Cooper, D. C., 163 F.Supp. 13), were held insufficient to support his order both by the Court of Appeals (8 Cir., 257 F.2d 33) and by the Supreme Court of the United States (358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5). If the factual situation as found by Judge Lemley, whose fact findings have never been questioned, were insufficient to sustain his order, we can see no basis whatever for a ruling by us that Act No. 4 constitutes a valid and reasonable exercise of the police power of Arkansas to meet an emergency.

"* * * Every exercise of the police power must be reasonable, and extend only to such laws as are enacted in good faith for the promotion of the public good, and not for the annoyance or oppression of a particular class." Plessy v. Ferguson, 163 U.S. 537, 550, 16 S.Ct. 1138, 1143, 41 L.Ed. 256. See and compare, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

■ With all due respect to the considered views of those Justices of the Supreme Court of Arkansas who concluded that Act No. 4 represented a valid exercise of the police power of the State and therefore did not violate the Fourteenth Amendment to the Constitution of the United States, we are firmly of the opinion that Act No. 4 cannot be sustained upon that ground, and is clearly unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment, and conferred no authority upon the Governor to close the public high schools in Little Rock.

The Supreme Court of Arkansas, in the case of Fitzhugh v. Ford, Ark., 323

S.W.2d 559, in a unanimous opinion filed on May 4, 1959, held that Act No. 5 violates no part of the Constitution of the State of Arkansas, but did not consider whether it violated any part of the Constitution of the United States. The Court said (page 560 of 323 S.W.2d):

"In essence, Act 5 provides: (a) It requires the Commissioner of Education to withhold certain *State Funds* (otherwise allocable to a school district wherein a school has been closed under said Act 4) in an amount calculated on a certain pro rata basis, the correctness of which is not challenged here and which is not material to this opinion; (b) It requires the Commissioner of Education to pay over to other *public schools* or *non-profit private schools* accredited by the State Board of Education from the funds so withheld an amount calculated on a pro rata basis according to the number of students (from the closed schools) attending a recipient school. Simply and briefly stated, Act 5 provides that the money which normally would be spent on a student in a closed school would be paid to the *school which he might later attend.*"

■ Since Act No. 5 is complementary to and dependent upon Act No. 4, and that Act is invalid, it follows that Act No. 5 is also invalid and completely ineffectual. We are satisfied that Act No. 5, as amended, cannot stand alone and did not, and does not, authorize the State Board of Education to deprive the Little Rock School District of State funds allocable to it for the maintenance of its schools on a constitutional basis, or to divert any part of those funds to other schools or other districts.[2]

2. Sections 2 and 3 of Act No. 5 of the Acts of the 2nd Extraordinary Session of the 61st General Assembly of Arkansas, approved September 12, 1958, as amended by Act No. 151 of the General Assembly for the year 1959, approved March 3, 1959, read as follows:

"Section 2. Whenever the Governor shall order any school to be closed, and continuing thereafter until such order shall have been countermanded by the Governor, or whenever any person of school age shall be accepted for enrollment in any school other than the one in which he normally would attend, the State Board of Education, acting through its Commissioner of Education, shall cause to be withheld from the State funds otherwise allocable to the school district having jurisdiction over any such closed school, or over any such school which any such person of school age normally would attend, an amount equal to the proportion of the total of such State funds that the total average daily attendance of students for the next preceding school year in the closed school, or in the school which any such person would normally attend, bears to the total average daily attendance of all students of the district for said next preceding school year; plus, and also from State funds, an amount equal to the same foregoing proportion of ad valorem taxes collected in the calendar year next preceding the date of any such closing order, or next preceding the date of acceptance for enrollment of any such student in the school which he normally would attend, for the benefit of the said school district for maintenance and operation; plus, also from State funds, an amount equal to the same foregoing proportion of all funds allocable to the school district during the then current fiscal year from the County General School Fund, all as set forth in the budget of the County Board of Education.

"Section 3. Should any of the students of any school so closed by order of the Governor, or any of the students eligible to attend any racially integrated school, determine to attend, and attend, in this State, any other public school, or any non-profit private school accredited by the State Board of Education, then State funds so withheld as hereinbefore provided, shall be paid over by the State Board of Education to each said other public school or accredited non-profit private school in an amount equal to the same proportion of the total said State funds that the number of transferred students in any such public or private school bears to the total number of students upon which said withholding was made as hereinbefore provided. Appropriations of funds from time to time made available to the State Board of Education, including but not limited to those contained in Act 305, approved March 27, 1957, shall be useable for the purposes herein provided."

There is no dispute as to the facts. The Little Rock public high schools were closed by the Governor, under Act No. 4, on September 12, 1958, before they were opened for the admission of students, and have remained closed ever since. The School Board has been precluded, by the closing of the public high schools, from carrying out its approved plan of gradual integration ordered into effect by the federal courts.

By virtue of Acts No. 4 and No. 5, as amended, $350,586 in funds allocable to the Little Rock School District had been withheld up to May 4, 1959. The total amount which will be withheld by the end of the 1958–59 school year, if these Acts remain in effect, will be slightly in excess of $510,000. Of the funds withheld, $187,768 has been paid to other schools, public and private, in accordance with Act No. 5. Of this amount, $71,907.50 was paid to the private Raney High School.

The total number of prospective high school students registered for the four high schools in Little Rock as of September, 1958, was 3,665. Of these, after the closing of the high schools by the Governor, 266 white students and 376 Negro students did not attend any school; the remainder transferred to private schools in Little Rock and to public and private schools within or without the State. The evidence shows where the white students went and where the Negro students went, but we find it unnecessary to go into that detail.

The purpose, effect, and results of the enactment and enforcement of Acts No. 4 and No. 5 are too obvious to require further discussion.

It is the judgment and declaration of this Court: that Act No. 4 of the Second Extraordinary Session of the General Assembly of Arkansas, 1958, is unconstitutional and invalid; that the proclamation of the Governor of Arkansas closing the public high schools in Little Rock was and is void; that Act No. 5, as amended, as a device for depriving the Little Rock School District of State funds allocable to it for the maintenance of its schools upon a constitutional basis, is also unconstitutional and invalid; that the diversion of such funds pursuant to Act No. 4 and Act No. 5 should be and is hereby permanently enjoined; that the Superintendent of the Schools of Little Rock, and the members of the Board of Directors of the Little Rock School District, and their successors, are under the continuing mandate of this District Court to effectuate the plan of integration for the public schools of Little Rock approved by this Court in Aaron v. Cooper, D.C., 143 F.Supp. 855 (affirmed, 8 Cir., 243 F.2d 361); and that this Court has heretofore retained jurisdiction to require the Superintendent and the School Board to take such affirmative steps as may hereafter be directed by this Court to accomplish the integration of the schools of Little Rock in accordance with and as required by the prior orders of this Court, and the orders and decisions of the Court of Appeals for the Eighth Circuit and of the Supreme Court of the United States.

It is further adjudged that the defendants and their successors in office be and are permanently enjoined from engaging in any acts which will, directly or indirectly, impede, thwart, delay or frustrate the execution of the approved plan for the gradual integration of the schools of Little Rock, the effectuation of which has been heretofore commanded by the orders of this Court.

The motions of the defendants to dismiss the supplemental complaint, which were taken under submission by the Court, are overruled.